# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. 1:06-00001 |
| | ) | JUDGE HAYNES |
| DAVID GABLE, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M

The United States filed this action against the Defendant David Gable charging him as a convicted felon in possession of a firearm.

Before the Court is the Defendant's motion to suppress (Docket Entry No. 14), contending, in sum, that his initial statements to the arresting officers and his post-arrest statements at the jail as well as the officer's warrantless seizure of the firearm at issue were obtained in violation of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. The government responds that the seizure of the weapon at issue was with the Defendant's consent and was otherwise proper and lawful and that the Defendant's initial statements to the officer were voluntary or were prior to his arrest and Miranda[1] warnings were not required. For his subsequent statements at the jail, the government contends that those statements were voluntarily made after Miranda warnings.

An evidentiary hearing was held on October 23, 2006 (Docket Entry No. 27) after which the parties submitted additional filings. (Docket Entry Nos. 26, 29 and 30). Set forth below are the Court's findings of fact and conclusions of law.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966)

## A. Findings of Fact

Between 9:00 a.m. and 9:30 a.m. on August 7, 2005, Kerry Mashburn, a deputy sheriff for Lawrence County and Jeremy Busby of the Loretto police department arrived at the residence of Billy Vines, who had earlier reported a domestic violence incident at his residence. The exact time of Vines's report of that incident is not established by the proof.

After his arrival, Mashburn questioned Vines who repeated his complaint. Vines, who is in his sixties, told Mashburn that for the prior two weeks or so, Gable had lived at his home and would return to his home late in the night or early in the morning, cursing and angry when he was refused entrance. According to Vines, on this occasion, Gable kicked a hole in the rear door of Vines's residence and entered Vines's home. Vines then armed himself. At some point, Gable returned to Vines's home because at the time of Mashburn's arrival, Gable was inside Vines's house in the living room and was arrested inside Vines's home.

Based upon Vines's statement, Mashburn decided to arrest Gable for domestic violence and arrested Gable at the back of the residence. Mashburn handcuffed Gable and placed Gable in his patrol vehicle. After Gable's arrest, Vines told Mashburn that Gable had taken a shotgun from Vines's home to his truck that was parked in the driveway at Vines's residence. Mashburn asked the Defendant about the shotgun and Gable responded that the gun was in his truck. According to Mashburn, Gable gave him permission to search his truck. Mashburn described these events as follows:

> Q.    Now, when you were dealing, prior to your arrest of Mr. Gable, <u>did you make inquiry of him after you spoke with Mr. Vines as to whether a shotgun was, in fact, involved in the immediate vicinity?</u>

2

A.      Yes, sir.

Q.      <u>Was this before he was arrested?</u>

A.      <u>No, this was after.</u>

Q.      What did he tell you?

A.      He said <u>after I placed him under arrest he had told me that - - I went back to</u>
        <u>the vehicle we put him into the patrol unit.  Mr. Vines then told me there was</u>
        <u>a gun.  I went to the car, asked David if there was a gun.  He said yes.  I asked</u>
        <u>him where.  He said, behind the seat of the vehicle.  I asked him if I could get</u>
        <u>into the vehicle and acquire the weapon.  He said yes.</u>

Q.      This was the same time vehicle that Mr. Vines had indicated to you where the
        weapon was?

A.      Yes, yes, yes.

Q.      Did you, in fact, retrieve a shotgun?

A.      Yes, I did.

Q.      Now, did you undertake interrogation of Mr. Gable about this episode on this
        date?

A.      No, sir.

Transcript at pp. 9-10 (emphasis added).

Mashburn explained that he did not give any <u>Miranda</u> warnings prior to asking Gable about

the gun because the incident involved a domestic dispute.  Tr. at 54.  Mashburn went 15-20 yards

from his patrol car to secure the shotgun in Gable's truck.  At that point, Gable asked what

Mashburn was doing with his shotgun.  Although Gable initially asserted ownership of the gun,

when Mashburn commented that Gable would be charged, Gable responded that the gun "wasn't

his."  Tr. at 73.

According to Gable, he had been living with Vines whom Gable considers to be his stepfather.

3

When the officers arrived on the morning of August 7th, Gable was inside Vines's residence looking out the living room window. As Gable walked toward the door, Mashburn told Gable that he was under arrest. According to Gable, Mashburn questioned Gable about the smell of marijuana, Gable responded that the marijuana was behind the house and then behind a tree in what appears to be a ruse. At some point, Gable stated that Mashburn "tackled" him, then handcuffed him and placed him in the patrol vehicle. Mashburn had prior experience catching Gable to arrest him. At that point, Mashburn talked to Vines and returned to the patrol car to question Gable about the gun. Gable told Mashburn the gun was in his truck, but it was not loaded.

Gable was jailed and Mashburn later obtained an arrest warrant for Gable on charges of domestic assault, vandalism and weapon possession. On August 8, 2005, while in custody, the Defendant was also served with a warrant for failure to pay child support. The proof does not establish when or if Gable were taken before a judicial officer on these charges. During this controversy, Gable did not have a lawyer.

Three days after the arrest, Mashburn interviewed Gable in jail and that interview was tape-recorded. Mashburn first gave Gable the <u>Miranda</u> warnings orally based on a waiver form, Government Exhibit No. 1, but Gable did not understand them. Mashburn states that he repeated the warnings. Mashburn did not ask if Gable understood the words in the oral warnings. Tr. at 50, 52. Mashburn did explain what he wanted to ask Gable. The tape recording of this interview contains the following, including several incriminating statements:

> I have David March Gable here, speaking with me.
>
> If you cannot afford to hire a lawyer, one will be afforded to represent you for any question that you wish for. Okay? If you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until [you] talk to a

4

lawyer. What this says right here, and I'm going to get you to sign it, I have read this statement of my rights, and I understand what my rights are. I am willing to make a statement and answer questions without my lawyer at this time. I understand and know what I am doing. No promises or treats have been made to me and no pressure or coercion of any kind has been used against me. That's threat. Okay. What I need you to do is sign this waiver if you are going to answer me some some questions. I need for you to sign it here saying you will. Okay? You don't have to sign it. If you want to have your lawyer present, you can. Okay? Just to let you know. And you did advise me that you could not read or write; is that correct?

Answer:     Yes, sir.

Question:   Can you spell your name?

Answer:     Yes, sir.

Question:   Will you spell your name for me, (inaudible).

Answer:     I don't have nothing to say. I ain't got nothing to say.

Question:   Okay. Do you want your lawyer present?

Answer:     I don't know - - I don't know why you are questioning me. I don't know why you are taking a statement from me.

Question:   Okay. The question I'm going to put to you, I arrested you on domestic violence on 8/7 of 2005, which is this past Sunday; right?

Answer:     Yes, sir.

Question:   Okay. You stated - - you had a firearm on you, a shotgun?

Answer:     Yes, sir.

Question:   Okay. That's what I mean to ask you questions about.

Answer:     Okay.

Question:   Okay?

Answer:     Okay.

Question:   Do you agree to sign the papers that I read you your rights, okay? Just so you understand, no coercion, nobody is forcing you to do this.

5

|  |  |
|---|---|
| | Write the time on there for me. It is now 10:24, write the time right there, 10:24 a.m. |
| Answer: | Right. |
| Question: | Okay. I want to ask you about, the day I brought in you in for domestic violence, for vandalism on the house, you had a shotgun in you possession. Actually, you told me it was in your truck, we had to get it out. Do you remember that? |
| Answer: | Yes, sir. |
| Question: | Okay. You told me then at the time that they - - you bought the gun from J.H. Keith (ph); is that correct? |
| Answer: | Yes, sir. |
| Question: | When did you purchase that gun from JH P? |
| Answer: | The night before. |
| Question: | So the night before would be the Saturday night, August 6, 2005? |
| Answer: | Sometime Saturday around - - after dinner. |
| Question: | Where did you purchase the gun from, his residence, or was it on the road? |
| Answer: | He had it with him. He had it at somebody's house. And he said he needed some money to get his son out of jail. So I gave him $96 and bought him two packs of cigarettes for a .20 gauge shotgun. |
| Question: | Do you know what kind of shotgun it was? |
| Answer: | .20 gauge. And I took it to where you arrested me at. |
| Question: | Yes, sir. |
| Answer: | And put it on a gun rack in his bedroom. Okay? And I was out sleeping in my truck. He woke me up with a water hose. And I woke up here or something. |
| Question: | You say he. Who are you talking about? |

6

| | |
|---|---|
| Answer: | Peter Vines. |
| Question: | Peter Vines. That's your stepfather, you told me? |
| Answer: | Yes, he is like my stepdaddy. |
| Question: | Okay. Do you know who J.H. retrieved the gun from? Do you know if he bought it new, or could you provide that information to me? |
| Answer: | I do not know. But I talked to his son, and he said it was a new shotgun. When I talked to him, and he said it was a new shotgun. And I told him I would give him $96 and two packs of cigarettes, because he was trying to get his son out of jail. And that's the only reason I bought it there, you know. |
| Question: | At the time you bought this shotgun, this .20 gauge shotgun, you knew you were a convicted felon; correct? Did you know you was a convicted felon? Or that you had been in the past. |
| Answer: | Well, I knew that I wasn't allowed to have a firearm with me, but I was going to have it at - - I was going to keep it at his house. I was going to give it to him. |
| Question: | Who is he you are talking about you was going to give it to? |
| Answer: | Peter Vines. |
| Question: | Your stepfather, right? |
| Answer: | Yes. |
| Question: | Was you going to give that to him as a gift, or was you just going to leave it at the house for your personal - - |
| Answer: | I was going to give it to him or, you know - - more or less, I was going to leave it there and go rabbit hunting in the winter time and squirrel hunting. I didn't get it for no other reason. Because he taught me to how to squirrel hunt, and he said that 30-10 or a .20 gauge was the best for squirrel hunting or rabbit hunting with. And it was like a new gun. And I felt, you go buy one at the store, it's going to cost you more than a hundred dollars. So and he said it wasn't hot, because he was going to sell it to get his son out of jail. And that's the only reason I bought it. And when I bought it, I went and put it on his gun rack, when I got it home, in his bedroom. |

7

| | |
|---|---|
| Question: | His name was J.H. Keith; right? |
| Answer: | Where I got if from. |
| Question: | The one you bought the shotgun from? |
| Answer: | Yes, it is. |
| Question: | Where did you say you bought it from? His residence, or - -? |
| Answer: | No, it was at somebody's house. |
| Question: | Do you remember whose house it was at? |
| Answer: | That's irrelevant, you know. |
| Question: | Okay. Okay. Now, why did you take the vehicle - - I'm sorry, why did you take the gun the shotgun out of the house and put in it the back, behind the back seat of your truck, where you told me it was at whenever I asked you about it? |
| Answer: | Because he told me - - he told me that - - |
| Question: | Specify when you say he. Who is he? |
| Answer: | Billy Vines told me to get the gun out of his house, okay? And I did. And I was on my way to leave, and you all pulled up. |
| Question: | Okay. All right. Did you take - - what did you do with the shotgun? |
| Answer: | I put it behind the seat. |
| Question: | Okay. |
| Answer: | It was - - it was broke down. There was no - - |
| Question: | Do you have shells for this? |
| Answer: | No, sir. |
| Question: | You had never bought any? |
| Answer: | No, because I wasn't - - |

8

Question:    So the only intention of this shotgun was to - -

Answer:    Squirrel and rabbit hunt.

Question:    Rabbit hunt with it?

Answer:    Right.  In the winter time.

Question:    Are you eligible - - are you eligible, that you know of, to get some type of hunting license?

Answer:    I was going to check into it.  I was going to check into it.

Question:    Okay.  How long has it been since you had a hunting license or been able to get them?

Answer:    I ain't never had them.  I ain't never had them.

Question:    Do you know, again, how long it has been since you was convicted for anything, by way of a felony record?  Could you tell me of that date, anything?

Answer:    It was in 2000.  Or it was in '99, because me and the girl I went to Georgia with, they got me with some - - like five grams of marijuana and some pills, stuff like that.

Question:    Did you spend time in the penitentiary?

Answer:    Two years.  I done like six or seven months.  And then I stayed out - - then when I got out, I went back to Georgia, and I come back with her like three times, and then she (inaudible) this, and I felt it.  And because I've been in this town all my life, I've been in trouble all my life.  So I figured I would leave and I would s[t]ay out of trouble and put everything I dealt with behind me.  All right.

And three years [] later I called Betty Riddle.  She works in the district - - up there with Jeremiah.  And I asked her, I said, Betty, have I got any points on me?  I was supposed to have probation violations warrant on me.  And she said, let me look.  She said, no, we sent it back last month.

I said, my mama is in bad health, and she's taking that - - what is it, dialysis, where your kidneys are messed up, dialysis or whatever, and I want to come back in case something happened.  Daddy said, I want

9

you to keep your nose clean and stay out of trouble, then you ain't got nothing to worry about.

Question:    Okay.  You tell me that you purchased a gun from J.H. Keith on Saturday, August 6, 2005.  Can you tell me what time?

Answer:    No, it was in the evening time.

Question:    Evening time?

Answer:    Yeah.

Question:    But it's a .20 gauge shotgun?

Answer:    Shotgun.

Question:    Single shot?

Answer:    Yeah.

Question:    Single shot.  And I believe it's a New England brand?  Does that sound right?

Answer:    I don't know.  All I know it's a .20 gauge.

Question:    (Inaudible) stock, (inaudible) barrel?

Answer:    Yeah.

Question:    Okay.

Answer:    I didn't do it to be - - you know, to do nothing wrong, you know.

Question:    But did you know you was a convicted felon?  Did you know that at the time that you was in possession of the gun or that you bought the gun?  Were you aware of it?

Answer:    Truthfully, no.  You know, because I can't read and write, and I know some law, but they say you can have a gun at your residence for security purposes, you know what I mean?  That's why I got it.  More or less I got it to keep at his house for me to hunt this winter.  I didn't do it - - I didn't get it for nothing else.

Question:    Okay.  Is there anything else you want to tell me about the gun at this

10

| | |
|---|---|
| | time before we - - your statement? |
| Answer: | Do I get my gun back? |
| Question: | That will be something you'll have to go through the court system about, okay. I can't answer that for you at this time. |
| Answer: | Or the money, either one? |
| Question: | We didn't take the money from you. We had (inaudible) taking the money. That money is yours. |
| Answer: | I'm talking the money from the gun. |
| Question: | I couldn't advi[s]e that either, David. |
| Answer: | Okay. Okay. |
| Question: | Excuse me. But if you have anything else as far as the gun, on this tape and this statement - - do you have anything else to add to it? |
| Answer: | (Inaudible) situation. All right. |
| Question: | All right. It's exactly 2:32 a.m., August 10, 2005. Statement ended. |

(Conclusion of playing of tape) (emphasis added).

This tape reflects that Mashburn read and asked Gable to sign a form that is a waiver of his Miranda rights and that Gable signed that form after the interview started. Government Exhibit No. 1. On this tape, Gable responded yes to a statement that there was "no coercion" and "nobody was forcing" him to sign the waiver form. Gable conceded that "I signed a piece of paper, I don't know what it was, I probably shouldn't have, but that's my fault." Tr. 11.

After Mashburn's second interview, Gable was also interviewed by Melinda Brewer, a domestic violence investigator with the Sheriff's department. Brewer wanted to question Gable about the domestic dispute. Brewer also had a parole violation warrant for Gable. Brewer had known Gable for twelve years and had arrested Gable at least seven or more times during her tenure

11

as a law enforcement officer. Brewer always considered Gable to understand what she stated to him, but she never gave Gable anything to read. Brewer was aware that Gable could not read. Brewer told Gable that she understood that Gable had been read his rights and asked Gable if he had any questions about his rights. According to Brewer, Gable responded no, but the underscored portion of the tape of Brewer's interview, reflects a less affirmative response from Gable.   Brewer's interview of Gable was also taped and as pertinent here, contains the following:

| | |
|---|---|
| Question: | Today's date is August 10, at the Lawrence County Sheriff's Department.  The time is 2:52.  Sergeant Melinda Brewer, Deputy Kerry Mashburn here to speak with David March Gable. |
| | Have your rights been read to you, David?  Do you acknowledge your rights? |
| Answer: | This morning, you read me some. |
| Question: | Okay.  Do you understand why you were placed under arrest? |
| Answer: | Yes, me and my stepdaddy had an argument. |
| Question: | Tell me about the argument.  Tell me what happened down there. Tell me your side of the story, what happened down there. |

*    *    *

| | |
|---|---|
| Question: | Okay.  But you didn't have a problem when the officers got there? |
| Answer: | No. |
| Question: | And you understood why they were there when they got there? |
| Answer: | No, not until they told me. |
| Question: | Okay.  Did you have any weapons on you when you were arrested, David? |
| Answer: | A gun.  He knows about it. |
| Question: | Tell me about it. |

12

| | |
|---|---|
| Answer: | He knows about it. |
| Question: | No, you have to tell me about it. |
| Answer: | It was a .20 gauge shotgun. |
| Question: | Where was it at? |
| Answer: | It was in the house. And he told me to get it out of his house. I got it out, put it behind my truck seat. And that's what I told the police where it was at. |
| Question: | But where were you when the police officers got there? |
| Answer: | In the house with him. |
| Question: | Okay. |
| Answer: | But the gun was in the truck |

*    *    *

After a few additional questions, the tape ends.

Gable explained that he spoke to Mashburn at the jail, because Mashburn assured him that if Gable told him about the shotgun, he would not be prosecuted for it. According to Gable, Mashburn also told him that if he confessed, then he would merely have to return to prison to "flatten" or finish out his prison sentence for a prior conviction. Gable stated that this promise was made before the tape recorder started. Gable who has been arrested "dozens of times," admitted that he probably knew he had a right to a lawyer upon his arrest.

The State of Tennessee did not prosecute Gable for illegally possessing the shotgun, but the United States filed this action and relies on the product of Mashburn's seizure of Gable's weapon and Mashburn's interviews of Gable, including Gable's signed Miranda waiver.

Gable also presented proof from Stephanie Keeton, his former girlfriend who testified that

13

Gable cannot read. Keeton reads Gable's mail and writes for him. According to Keeton, Gable does not understand "major" words, only "small words." Tr. at 80. When asked, Keeton did not know what the word waiver means. Based upon her observations, Gable did not have any mental infirmities, until 2005 when after losing a finger at work, Gable became depressed, confused and believed that people were watching him, including behind mirrors and walls. During 2005, Gable would remain awake all night rambling through the house, beating on the walls and entering Keeton's room, insisting someone was with her. Gable would also wake up Keeton's children. Gable was admitted for a mental evaluation in 2005, two to three months before Keeton left him in July 2005. Keeton had earlier left Gable.

Dr. Pamela Auble who has a Ph.D. in psychology and specializes in neuropsychological testing, administered a battery of tests and evaluated Gable. Dr. Auble found that Gable has an IQ of 80, with a verbal IQ of 69 and a nonvisual IQ of 98. Tr.at 89. In Dr. Auble's opinion, Gable reads at the first grade level that means he effectively cannot read. Dr. Auble found that Gable had "a very, very large discrepancy between his verbal abilities and his visual reading, for example his ability to put puzzles together, things of that nature." Id. In Dr. Auble's opinion, Gable has psychological impairments, psychosis and schizophrenia, but is competent. Tr. at 92. Dr. Auble explained that as to his legal situation "I thought his grasp of what he is charged with and his legal situation seemed fairly logical," tr. at 93 and that "his understanding of this legal situation was rational and did not show evidence of delusions or paranoia." Tr. at 94. Yet, as to words, Dr. Auble opined that Gable would not understand the word "waiver." After hearing the Mashburn tape-recorded interview, Dr. Auble opined that Gable would not have understood the oral warnings that Mashburn gave.

14

## B. CONCLUSIONS OF LAW

### 1. Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their person, houses, paper, and effects, against unreasonable searches and seizures." <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996).  First, based upon the information that Mashburn obtained from Vines and his personal knowledge of Gable, there were ample facts to establish probable cause for Mashburn's arrest of Gable. <u>Illinois v. Gates</u>, 462 U.S. 213, 230-31 (1983).

As to the search of Gable's truck and seizure of his shotgun, as a general rule "[s]earches conducted without warrants have been held unlawful 'notwithstanding the facts unquestionably showing probable cause,'" and "are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967). (quoting in part <u>Agnello v. United States</u>, 269 U.S. 20, 33 (1925)).

There are several exceptions to the warrant requirement and four are at issue here: (1) a search incident to a lawful arrest; (2) search incident to probable cause; (3) the Defendant's consent; and (4) exigent circumstances.  As to the search incident to arrest, the government relies upon <u>Thorton v. United States</u>, 541 U.S. 615 (2004) and <u>United States v. Robinson</u>, 390 F.3d 853, 871 n.27 (6th Cir.2004) (following <u>Thorton</u>). By its language, <u>Thorton</u> permits a warrantless search upon a valid arrest "[s]o long as an arrestee is the sort of 'recent occupant' of a vehicle such as petitioner here, [then] officers may search that vehicle incident to the arrest." <u>Thorton</u>, 541 U.S. at 623-24.

Here, the proof does not establish the amount of time that had passed since Gable left his truck and the officers' arrival at Vines's residence. Given Vines's descriptions of the incident and Gable's prior conduct, the passage of time could be an hour or several hours. When the officers

15

arrived, Gable was inside Vines's residence, where he was arrested. The Court concludes that the government has not established the facts necessary to invoke the Thorton rule requiring the defendant to have been a 'recent occupant' of the searched vehicle.

As to the search incident to probable cause, the government relies upon United States v. Swanson, 341 F.3d 524, 532-33 (6th Cir.2003) and Smith v. Thornburg, 136 F.3d 1070, 1074 (6th Cir.1998). In Swanson, the vehicle was used as an instrument of a crime and therefore, as a matter of law, was subject to seizure and search without a warrant. 341 F.3d at 532-33. ("First, the agents had probable cause to seize and search the vehicle. [The defendant] had used the Grand Am to deliver an automatic weapon thirty days earlier to a confidential informant . ..").  In Smith, this rule was held to apply to a warrantless search of a "readily mobile vehicle". 136 F.3d at 1074. Gable's vehicle was parked and Gable was inside Vines's residence. Gable was initially in Vines's residence and at the time of the search was handcuffed in Mashburn's vehicle. There is not any proof that the Gable's vehicle was "readily mobile". Thus, Gable's truck was "readily mobile" when Mashburn searched the truck for a weapon. Thus, the Court concludes that Swanson and Smith are factually inapposite and  the search incident to probable cause doctrine is inapplicable here.

For the consent exception[2] for a warrantless search, such consent must be "voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 223 (1973).  The Government bears the burden of proving consent at a suppression hearing by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). In United States v. Ivy, 165 F.3d 397 (1998), the Sixth Circuit summarized the standards for the government's proof:

---

[2]Gable's consent to the search of his vehicle is a different issue than his Miranda claim involving his disputed consent to be interviewed.  See Dickerson v. United States, 530 U.S. 428, 441 (2000).

16

The government bears the burden of proving, through "clear and positive testimony" that the consent to search was given voluntarily....Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion."....Several factors should be examined in this determination. First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. Second, a court should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, and indications of "more subtle forms of coercion that might flaw [an individual's] judgment."

\* \* \*

As a threshold consideration, the length of detention before consent is a significant factor in any voluntariness determination.

Id. at 402 (quoting United States v. Watson, 423 U.S. 411, 424 (1976); Bustamonte, 412 U.S. at 248 and United States v. McCaleb, 552 F.2d 717, 721 (6th Cir.1977)). (other citations omitted).

For this consent to search issue, Gable's statement to Mashburn was after Gable was handcuffed and placed in Mashburn's patrol vehicle. Gable, however, had been inside Mashburn's patrol vehicle only for a short period of time. Gable has a low IQ, is not well educated and reads at the first grade level. The proof is that Mashburn did not give any Miranda warnings at the time he arrested Gable at the scene. As discussed infra, such warnings were required at that time. To be sure, Gable has a lengthy criminal history and by his testimony, "probably" understood his right to counsel. Given Gable's arrest and confinement in Mashburn's patrol vehicle, the Court finds that Gable's statement that Mashburn could search his truck, was not "uncontaminated by any duress or coercion". Ivy, 165 F.3d at 402. Thus, the Court concludes that under the totality of the circumstances, the Government has not shown that Gable's consent for Mashburn's search of Gable's truck was voluntarily and intelligently given.

For the exigent circumstances exception, the facts must establish that "'real immediate and

17

serious consequences'" will "certainly occur" if the police officer postpones action to obtain a warrant. Welsh v. Wisconsin, 466 U.S. 740, 751 (1984); Thacker v. City of Columbus, 328 F.3d 244, 253 (6th Cir.2003). Examples of exigent circumstances include: "'1) hot pursuit of a fleeing felon, 2) imminent destruction of evidence, 3) the need to prevent a suspect's escape, and 4) a risk of danger to the police or others.'" Thacker, 328 F.3d at 253 (quoting United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994)). Other exigent circumstances are: "1) where contraband is discovered in the course of a protective sweep; and 2) where the contraband is in plain view." United States v. Santos, 303 F.Supp.2d 333, 345-46 (S.D.N.Y. 2003).

On the issue of exigent circumstances, "[t]he relevant inquiry is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir.2002) (citation omitted). "Moreover, the critical time for determining whether exigency exists 'is the moment of the warrantless entry by officers' onto the premises of the defendant." United States v. Morgan, 743 F.2d 1158, 1162 (6th Cir.1984) (quoting United States v. Killebrew, 560 F.2d 729, 733 (6th Cir.1977)). This exception is to be "construed narrowly" United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994).

For this exception, the government bears the burden to prove exigent circumstances and to overcome the presumption against warrantless searches, Welsh, 466 U.S. at 750, and the court is to consider the totality of the circumstances. Thacker, 328 F.3d at 254. For "the totality of the circumstances . . . the [defendant's] conduct, and the uncertainty of the situation . . ." must be considered. Id. Other factors are "the gravity of the crime and likelihood that the suspect is armed." Minnesota v. Olson, 495 U.S. 91, 100 (1990) and whether the officers' presence is due to a 911 call.

Thacker, 328 F.3d at 254.

"Courts have recognized the combustible nature of domestic disputes" and have granted police officers "great latitude" in such circumstances. Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998). In Tierney, the Second Circuit found exigent circumstances to enter a residence despite the victim's denial of intimidation and danger. Id. at 197-98. The police officer was responding to a 911 call and believed a domestic dispute victim inside the residence was in danger.

To determine whether exigent circumstances existed here, the issue is whether from the totality of the circumstances, Mashburn could reasonably believe that harm to the officers at the scene and/or Vines would "certainly occur", if the weapon were not found and secured. Here, at the time of Gable's arrest and Mashburn's subsequent seizure of Gable's weapon, the particulars of the threatening events had subsided. Mashburn arrived at the scene at approximately 9:00 to 9:30 a.m. on August 7th that was at some unspecified time after Vines's initial complaint. When Mashburn arrived, Gable was inside Vines's home. Mashburn did not refer to Gable as displaying any hostility to Vines or the officers. Without the precise or approximate time and based upon Vines's description of Gable's general conduct, as much as an hour or several hours could have passed before the officers arrived. To be sure, when interviewed by Mashburn, Vines reiterated his concerns about his personal safety. Yet, at the moment of Mashburn's warrantless entry into Gable's truck, Gable was neither in possession of nor near his weapon. At that time when Mashburn seized the weapon, Gable had been arrested, handcuffed and was secured in Mashburn's patrol vehicle.

Under the totality of the circumstances here, the Court concludes that exigent circumstances did not exist to justify Mashburn's warrantless search of Gable's truck and his seizure of the weapon inside that truck. Although the report involved domestic violence, the actual facts of the

19

scene when the officers arrive and remain, must establish exigent circumstances. The proof here does not meet the requirements for the exigent circumstances exception to a warrantless search.

Here, the governing decision for the search incident to arrest is <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969) that limits the warrantless search to the area where the defendant might conceal or reach for a weapon or destroy evidence. In the Sixth Circuit, this area is defined by the person's "wingspan". <u>United States v. Hudson</u>, 405 F.3d 425, 432 (6th Cir.2005). Here, at the time of Mashburn's search and subsequent seizure of the weapon, Gable was in handcuffs and inside the patrol car 15 to 20 yards away from his truck. This search does not qualify for the warrantless search exception under <u>Chimel</u>.

Thus, the Court concludes that the Defendant's Fourth Amendment rights were violated by Mashburn's warrantless search of Gable's vehicle and his seizure of the weapon.

## 2. **Miranda** Claim

As to Gable's <u>Miranda</u> claim, this issue arises in three factual contexts: (1) Mashburn's questioning of Gable about the weapon after his arrest and placement in the patrol vehicle without a prior <u>Miranda</u> warning; (2) Mashburn's second questioning of Gable in the county jail with disputed <u>Miranda</u> warnings; and (3) Brewer's questioning of Gable after Mashburn's questioning.

When an individual is in police custody or otherwise deprived of his freedom by state authorities in any significant way and is subject to questioning, procedural rights exist to protect the individual's Fifth Amendment privilege against self-incrimination. The original formulation of those rights was stated in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

> In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel

20

would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

Id. at 473-74. (emphasis added). In Dickerson v. United States, 530 U.S. 428, 444 (2000), the Supreme Court held that Miranda to be a constitutional rule.

To be sure, under Oregon v. Elstad, 470 U.S. 298, 309-10, (1985), voluntary statements that are given without prior Miranda warnings can be admissible. Factors such as intervening time, removal of the prisoner to a different place, and change in identity of interrogators can render the statements admissible. Id.

When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession. See Westover v. United States, decided together with Miranda v. Arizona, 384 U.S., at 494, 86 S.Ct., at 1638; Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). The failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. . .

21

\*   \*   \*

When police ask questions of a suspect in custody without administering the required warnings, <u>Miranda</u> dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief. The Court has carefully adhered to this principle, permitting a narrow exception only where pressing public safety concerns demanded. . . . . <u>We do not imply that good faith excuses a failure to administer Miranda warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him. . . . The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.</u> We find that the dictates of <u>Miranda</u> and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. <u>We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.</u>

<u>Id.</u> at 310, 317, 318. (emphasis added).

Yet, where officers deliberately question a person in custody without <u>Miranda</u> warnings and then conduct a second interview with <u>Miranda</u> warnings and ask same questions, the <u>Miranda</u> principles are circumvented and compromised and the person's answers to the second questioning are inadmissible. <u>Missouri v. Seibert</u>, 542 U.S. 600, 617 (2004).

As to the point at which the <u>Miranda</u> warnings are triggered, in <u>Abela v. Martin</u>, 380 F.3d 915 (6th Cir.2004), the Sixth Circuit summarized the circumstances:

This right is triggered when a suspect is interrogated while "in custody" or "otherwise deprived of his freedom in any significant way." <u>Miranda</u>, 384 U.S. at 444, 86 S.Ct. 1602; <u>California v. Beheler</u>, 463 U.S. 1121, 1126, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (holding that suspect's voluntary appearance and departure at police station for questioning was not custodial interrogation). The Supreme Court has broadly defined "interrogation" as any police questioning of a suspect in custody

22

"reasonably likely to elicit an incriminating response." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 n. 7, 302, n. 8, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

<u>Id.</u> at 925.

Mashburn's initial questioning of Gable occurred after Mashburn arrested Gable, handcuffed him and placed him in the patrol vehicle. At that point, Mashburn had focused on Gable and clearly Gable was "in custody." Mashburn's questions to Gable about the gun clearly would implicate Gable, as reflected by the weapons charge that Mashburn pursued after Gable's arrest. In such circumstances, <u>Miranda</u> warnings were required, but were not provided.

As to Gable's waiver of <u>Miranda</u> rights by responding to Mashburn, any waiver of <u>Miranda</u> rights must be voluntary, knowing, and intelligent. <u>Edwards v.Arizona</u>, 451 U.S. 477, 482 (1981). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id</u>. The underlying purpose of these requirements is that "the accused must be adequately and effectively apprised of his rights" to combat the pressures inherent to custodial interrogation and "to permit a full opportunity to exercise the privilege against self-incrimination." <u>Miranda</u>, 384 U.S. at 467.

The <u>Miranda</u> waiver inquiry requires consideration of more than the "totality of the circumstances." <u>Dickerson</u>, 530 U.S. at 444 ("The disadvantage of the <u>Miranda</u> rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result. <u>But experience suggests that the totality-of-the-circumstances test which § 3501 seeks to revive is more difficult</u>

23

than Miranda for law enforcement officers to conform to, and for courts to apply in a consistent manner."). (emphasis added).

As a matter of law, "[t]he Courts must presume that a defendant did not waive his [Miranda] rights; the prosecution's burden is great; but in at least some cases waiver can be clearly be inferred from the actions and words of the person interrogated. North Carolina v. Butler, 441 U.S. 369, 373 (1979). "The question *is not one of form*, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." Id. (emphasis added). "A police warning, to be effective, must be given with proper solicitude for actual understanding." Frazier v. United States, 419 F.2d 1161, 1166 n.24 (D.C. Cir. 1969). The courts must carefully scrutinize any waiver of Miranda rights after a defendant's incriminating statement without Miranda warnings because "the point is that the warning is unlikely to be effective in the question-first sequence we have described." Seibert, 542 U.S. at 613 n.5 .

Based upon the coercive circumstances of Mashburn's first questioning of Gable, coupled with the lack of a Miranda warning, the Court concludes that Gable did not voluntarily waive his Miranda rights for Mashburn's initial questioning about the gun.

To be sure, an exigent circumstances exception to Miranda warnings requirement exists. New York v. Quarles, 467 U.S. 649, 656 (1984); United States v. Talley, 275 F.3d 560, 563 (6th Cir.2001). To excuse Miranda warnings under this exception, this issue is whether the "officers have a reasonable belief based upon articulable facts that they are in danger". Talley, 275 F.3d at 563. This exception requires proof (1) that the arrestee has or recently had a weapon and (2) that "someone other than the police could access the weapon and inflict harm with it" United States v. Williams, 2007WL62607 at *2 (6th Cir. Jan. 9, 2007). Here, Gable earlier had a weapon, but how

24

recent in relation to the officers' arrival is unclear. As stated in the Fourth Amendment analysis, at the time of the weapon search, Gable was completely unable to access the weapon and there are not any facts that Vines posed any threat. Thus, the Court concludes that the officers were not in danger and exigent circumstances did not exist at the time of Gable's arrest to excuse the requirement of <u>Miranda</u> warnings prior to Mashburn's first questioning of Gable about the weapon.

The next <u>Miranda</u> issues center on the admissibility of Gable's statements in response to Mashburn's second round of questioning three days later in the jail after Gable's arrest. In the second interview, Mashburn gave <u>Miranda</u> warnings orally and during the interview, Gable signed a <u>Miranda</u> waiver form that Mashburh provided. Government Exhibit.1. During the tape-recorded interview, after asked to spell his name, Gable's first recorded response is " I don't have nothing to say. I ain't got nothing to say." These statements are inconsistent with a voluntary waiver of <u>Miranda</u> rights. When asked whether he wanted a lawyer, Gable first responded that he did not know because he could not understand why Mashburn was questioning him. When Mashburn answered Gable's questions about what Mashburn wanted to ask him, Mashburn repeated Gable's statements about the gun at his arrest. Mashburn then asked if Gable would agree to sign the waiver form and stated: "Just so you understand, no coercion, nobody is forcing you to do this." <u>Supra</u> at p.5. Gable responded: "right."

Gable testified that he did not understand the oral warnings and Mashburn acknowledged this fact. Although Gable refers to Mashburn's promises not to prosecute him, there were not any such statements that are not on this tape. In any event, Dr. Auble who tested Gable and heard the Mashburn tape, opined that Gable would not have understood Mashburn's oral warnings on this tape. Based upon Dr. Auble and Keeton's testimony, the Court finds that Gable did not understand

the word "coercion", but would have understood "forcing".

Yet, as reflected by Gable's quoted statements, the tape reflects that just after the questioning begins, Gable stated that he did not want to talk. Under <u>Miranda</u>, "[o]nce warnings have been given, the subsequent procedure is clear. <u>If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.</u> At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U.S. at 473-74. (emphasis added). Here, even if Gable understood the word forcing, the Court concludes that his statements were involuntary because the interview should not have proceeded after Gable stated he did not want to talk to Mashburn.

As to the written waiver, the Court credits Dr. Auble's opinion based upon her testing that Gable cannot read and would not have understood this written <u>Miranda</u> waiver form that he signed. This form cannot establish Gable's waiver of his <u>Miranda</u> rights.

As to Gable's continued responses to Mashburn's questioning as a waiver, "the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." <u>Butler</u>, 441 U.S. at 374-75. <u>Accord</u> <u>Edwards</u> 451 U.S. at 482. "[I]t is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case including the background, experience, and conduct of the accused." On this question, state courts consider a defendant's criminal history. <u>See</u> <u>Ledbetter v. Edwards</u>, 35 F.3d 1062, 1069 (6th Cir.1994) (internal quotations removed).

26

For what measures are required for a valid waiver of <u>Miranda</u> rights, "the accused must be adequately and effectively apprised of his rights" so as "to permit a full opportunity to exercise the privilege against self-incrimination. <u>Miranda</u>, 584 U.S. at 467. Yet, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." <u>Colorado v. Springs</u>, 479 U.S. 564 (1987) ("[W]e hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege"). "If a defendant cannot understand the nature of his rights, he cannot waive them intelligently." <u>Miller v. Dugger</u>, 838 F.2d 1530, 1539 (11th Cir. 1988). "[A] police warning, to be effective, must be given with proper solicitude for actual understanding." <u>Frazier</u>, 419 F.2d at 1166 n.24.

In addition to his failure to understand the <u>Miranda</u> warning, Gable initially refused to be interviewed. At that point, Mashburn referred to Gable's earlier statements about the gun after his arrest that were without <u>Miranda</u> warnings.

> Question:     Okay. I want to ask you about, the day I brought in you in for domestic violence, for vandalism on the house, you had a shotgun in you possession. <u>Actually, you told me it was in your truck, we had to get it out. Do you remember that?</u> ...
>
> Question:     Okay. <u>You told me then at the time that they - - you bought the gun from J.H. Keith (ph); is that correct?</u>
>
> Answer:       Yes, sir.

<u>Supra</u> at p 6.

27

Despite his initial opposition, Mashburn continued to question Gable and Gable continued to talk to Mashburn. Although Gable did not understand Mashburn's <u>Miranda</u> warnings, he has a significant criminal history of twelve arrests. Gable concedes that he probably knew his rights to counsel. Dr. Auble testified that she found Gable capable of understanding his legal situation. The Court notes that at one point during Mashburn's questioning, Gable responded to a question about a house: "That's irrelevant, you know." The Court finds that Gable's continued statements in the second interview establish his awareness of his right to counsel and his legal situation that is independent of any warning from Mashburn.

Yet, Gable's initial responses in the second interview was that he did not want to talk. Under <u>Miranda</u> that statement should have terminated the interview.

The Government also relies upon Gable's statements at the beginning and near the end of the Brewer interview to establish that Gable's statements were voluntary. For his response to Brewer's initial question about having his rights read to him, Gable stated: "This morning, you read me some." <u>Supra</u> at p. 12. Near the end of the third questioning, Brewer made a statement about the lack of coercion and then asked a question an officer's statement.

| | |
|---|---|
| Question: | <u>I just want to make sure that we didn't coerce you or threaten you or in any way push you into saying that you own that weapon. Did either officer tell you that?</u> |
| Answer: | <u>uh-uh.</u> I told him I bought it, because he said he need some money to get his son out of jail. And he wanted a hundred dollars. And he said. I need some cigarettes. I said, I will give you $96 and two packs of cigarettes. |

28

Supra at p. 13 (emphasis added).

Gable's response was not a definitive no, but rather an ambiguous "uh-uh". Id. at p. 13. It is unclear to the Court, if Gable's "un-uh" response is to Brewer's statement or her question. By the time of that statement, Gable had gone through three rounds of questioning, one where he was handcuffed in a patrol vehicle and the latter two interviews while he was in jail. Gable's initial responses in the second interview was that he did not want to talk. Under Miranda that statement should have terminated the interview. Under these circumstances, the Court concludes that Gable's statements in his post-arrest and jailhouse questioning were involuntary.

A two-stage interview process, where the defendant's prior statement is obtained without Miranda warnings and is followed by a second interview with Miranda warnings, can be coercive. See Seibert, 542 U.S. at 612. For a "two-staged interrogation technique," in Seibert, in his concurring opinion, Justice Breyer suggested the following test: "[C]ourts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith. 542 U.S. at 167 (Breyer J. concurring).

The proof does not establish, as in Seibert, that the officers' intentionally questioned and deliberately refused to give Miranda warnings initially to elicit incriminating answers and then sought to cleanse that deliberate omission, with a second interview, with Miranda warnings to elicit the same incriminating responses. Based upon the report that the officers faced a domestic violence, Mashburn's explanation on his failure to give Miranda warnings prior to his initial questioning of Gable about the gun, and the judicial decisions recognizing domestic violence disputes as a basis for exigent circumstances, the Court concludes that Mashburn's failure to give the Miranda warnings in his initial questioning was in good faith. Yet, Mashburn's initial questioning of Gable clearly

required  Miranda warnings, given the absence of any facts of a threat to the officers at that time. In the second interview, Mashburn ignored Gable's statement that he did not want to talk. In the second and third interviews, Mashburn and Brewer relied upon Gable's responses to Mashburn's flawed first interview.  The  facts here do not establish  clearly voluntary statements as in  Elstad, but rather a multiple tier questioning.

Given that Miranda is a constitutional rule and requires exclusion of unwarned and involuntary statements, the Court concludes that  Gable's responses during Mashburn's initial questioning was in violation of Miranda. The Court also concludes that the second and third interviews that  utilized the fruits of the flawed first interview so that Gable's statements in those interviews were also obtained in violation of Miranda.

### 3. Involuntary Confession Claim

Gable's final claim is that his responses during Mashburn's second questioning at the jail were based upon Mashburn's assurances that Gable would not be prosecuted for anything  he told Mashburn. Thus, Gable contends that Mashburn's  alleged misrepresentation render his statements involuntary under Due Process Clause of the Fifth Amendment adopts a totality of the circumstances test.  United States v. Johnson, 351 F.3d 254, 260 (6th Cir.2003).  "A confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession."  Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002).   Moreover, "[a]s a general rule, fundamental fairness requires that promises made during plea-bargain and analogous contexts be respected."  United States v. Streebing, 987 F.2d 368, 372 (6th Cir.1993).  (internal quotations omitted).

Mashburn denies any such representation and affirms that the tape recording contains his

30

entire conversation with Gable at the jail. The Court credits Mashburn's testimony and concludes that this claim lacks merit.

For the above stated reasons, the Court concludes that defendant's motion to suppress (Docket Entry No. 14) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the _____ 31st _____ day of May, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge

31